1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Xcentric Ventures, LLC, | ) | No. CV-12-130-PHX-SMM |
| Plaintiff, | ) ) | |
| v. | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Mediolex Ltd., Complaintsboard.com, Sergey Kudrjavcev, | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

This case involves claims of copyright infringement, trademark infringement and unfair competition under federal and state law. Plaintiff Xcentric Ventures ("Xcentric") contends that Defendants Mediolex Ltd., Complaintsboard.com, and Sergey Kudrjavcev (collectively "Defendants") infringed on its trademark rights by using RIPOFF REPORT, RIP-OFF REPORT, and DON'T LET THEM GET AWAY WITH IT on a website. Plaintiff seeks a judgment of liability, monetary damages, and permanent injunctive relief. The Court held a two-day bench trial beginning on April 15, 2014. Having heard the evidence and determined the credibility of witnesses, the Court now enters its Findings of Fact, Conclusions of Law, and Order pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

**Parties**

1.     Xcentric is an Arizona limited liability company with its principal place of business in Tempe, Arizona. (Doc. 1 at 2.) Xcentric owns and operates the website

1    <www.ripoffreport.com> (the "Ripoff Report website"). (Id.)

2    2.    Defendant Mediolex Ltd. ("Mediolex") is a foreign corporation incorporated in the

3          Republic of Seychelles. (Doc. 11 at 2.) The Court finds Mediolex's principal place of

4          business to be Latvia.

5    3.    Defendant Complaintsboard.com is a Latvian business entity of unknown form

6          ("Complaintsboard") that owns and operates a website by the same name

7          <www.complaintsboard.com> (the "Complaintsboard website"). Complaintsboard is

8          a wholly owned subsidiary of Mediolex.

9    4.    Defendant Sergey Kudrjavcev is a foreign national residing in Latvia. The complaint

10         named Mr. Kudrjavcev according to his pseudonym Mark Schultz. Mr. Kudrjavcev

11         is the owner of Mediolex and director of Complaintsboard.

12   **Procedural Background**

13   *Prior Litigation*

14   5.    On December 17, 2008, Xcentric filed suit in the District of Arizona against Elizabeth

15         Arden doing business as Complaintsboard alleging trademark infringement and

16         copyright infringement. Xcentric Ventures, LLC, v. Elizabeth Arden et al., No. 2:08-

17         cv-2299-HRH (D. Ariz.), ECF No. 1. On October 22, 2009, Plaintiff obtained a

18         default judgment for $60,000, as well as a permanent injunction enjoining future

19         wilful infringement. Id., ECF No. 16.

20   6.    On March 3, 2010, Plaintiff registered the judgment in Northern District of California

21         and moved for a writ of execution to be levied upon the Complaintsboard domain

22         name. Xcentric Ventures, LLC, v. Elizabeth Arden et al., No.3:10-mc-80058-SI (N.D.

23         Cal.), ECF Nos. 1, 8. On September 16, 2010, Complaintsboard paid $63,541.49 to

24         satisfy the default judgment. Id., ECF No. 26-1 at 5.

25   7.    On December 3, 2010, the court issued a writ of execution to be levied upon the

26         Complaintsboard domain name in the amount of $39,708 for attorneys and

27         investigative fees. Id., ECF No. 25. On December 8, 2010, Complaintsboard paid

28         $40,000 to satisfy the writ of execution; the next day, Complaintsboard moved the

court to vacate the writ of execution. Id., ECF Nos. 26, 26-1 at 12. In turn, the court ordered Plaintiff to show cause why the writ of execution should not be vacated. Id., ECF No. 27.

8.  On January 28, 2011, Plaintiff filed a motion requesting the court order registration of the Complaintsboard Domain Name be transferred to Plaintiff because the terms of the permanent injunction had allegedly been violated. Id., ECF No. 28. On March 2, 2011, the court denied Plaintiff's motion, found Complaintsboard had satisfied the monetary judgment against them, and vacated the writ of execution. Id., ECF No. 36.

9.  On April 4, 2011, and back in the District of Arizona, Plaintiff renewed its motion requesting the court order the transfer of registration of the Complaintsboard domain name to Plaintiff because the terms of the permanent injunction had allegedly been violated.  Xcentric Ventures, LLC, No. 2:08-cv-2299-HRH (D. Ariz.), ECF No. 20. In opposition to Plaintiff's motion, Mr. Kudrjavcev submitted a sworn declaration under the name Mark Schultz. Id., ECF No. 28. On August 5, 2011, the court denied Plaintiff's motion because there was no clear and convincing evidence of wilful infringement. Id., ECF No. 35.

*Instant Action & Findings of Fact*

10. Plaintiff commenced the instant action on January 20, 2012. (Doc. 1.)

11. Plaintiff alleges four claims under federal law: (1) copyright infringement in violation of 17 U.S.C. § 106; (2) contributory copyright infringement in violation of 17 U.S.C. § 106; (3) trademark infringement in violation of 15 U.S.C. § 1114(1); and (4) trademark infringement in violation of 15 U.S.C. 1125(a). Plaintiff alleges one claim under the common law of Arizona: unfair competition.

12. Both of Plaintiff's copyright claims were dismissed for failure to state a claim. (Doc. 22.) Although Plaintiff was granted leave to amend, no amended complaint was filed.

13. Plaintiff voluntarily abandoned its trademark infringement claim in violation of 15 U.S.C. § 1125, and there was no evidence presented at trial concerning this claim.

/ / /

**Plaintiff's Rights in Registered Marks**

14. Duckbites Holdings, LLC, ("Duckbites") is an Arizona limited liability company and is the registrant of the registered service marks at issue: number 2,958,949 RIP-OFF REPORT (" '949 service mark") (Ex. 32); and number 2,824,390 DON'T LET THEM GET AWAY WITH IT (" '390 service mark") (Ex. 38). (<u>See</u> Doc. 21 at 1.) Xcentric assigned these marks to Duckbites on October 15, 2012. (Ex. 1.) Ed Magedson manages both entities. (<u>Id.</u>)

15. On June 3, 2009, Duckbites and Xcentric executed a licensing agreement (the "Licensing Agreement") in which Xcentric is a non-exclusive licensee of the RIP-OFF REPORT and DON'T LET THEM GET AWAY WITH IT marks. (<u>Id.</u>)

16. The licensing agreement requires Xcentric to promptly alert Duckbites about any infringement and allows Xcentric and/or Duckbites to commence suit against an infringing party. (<u>Id.</u>)

17. Xcentric has an interest in the RIP-OFF REPORT and DON'T LET THEM GET AWAY WITH IT marks. Xcentric failed to introduce evidence that either mark satisfied the statutory requirements for incontestability.

18. Duckbites is also the owner of registered service mark 4,360,560, RIPOFF REPORT (the " '560 service mark"). This mark was registered on July 2, 2013, several years after the Licensing Agreement (Ex. 32), but the Licensing Agreement did not convey any common law marks, nor was it amended. There were no supplemental licensing agreements.

19. Xcentric failed to show that it has any interest in the '560 service mark RIPOFF REPORT.

**The Websites**

*The Ripoff Report Website*

20. The Ripoff Report website operates as a forum for consumers to post negative evaluations, or "reports" about businesses. There is no charge for this service.

21. On of the features of this service is a section for each report in which other users may

leave comments about their experiences with the company.

22.   There are approximately 1.7 million reports.

23.   The Ripoff Report website also offers a paid service called the "Corporate Advocacy Program" in which Xcentric assists businesses to respond to adverse reports.

24.   The Ripoff Report website generates revenue by selling advertising space on its webpages and through the Corporate Advocacy Program.

25.   Xcentric's general counsel from July 2009 to July 2013, David Gingras, testified that the founder and editor of the Ripoff Report website is Ed Magedson.

*The Complaintsboard Website*

26.   The Complaintsboard website operates a similar forum in which consumers can post negative evaluations, or "complaints" about businesses. There is no charge for this service, and there is a section for users to post comments.

27.   There are more than 5 million web pages.

28.   Mediolex does not offer any paid services, and generates all its revenue by selling advertising space on its webpages.

*Comparative Characteristics*

29.   The free forum service on the Ripoff Report website and the free forum service on the Complaintsboard website are virtually indistinguishable. Mr. Kudrjavcev testified that some consumers patronize the forum services on both the Ripoff Report and the Complaintsboard websites. The Court finds Mr. Kudrjavcev credible in this regard, and further finds the two websites' forum services are direct competitors.

30.   Unlike the Ripoff Report website, the Complaintsboard website does not offer any for-pay services, nor does the Complaintsboard website offer any service that is comparable or analogous to the Consumer Advocacy Program offered by the Ripoff Report website. The websites do not directly compete in this regard.

31.   Mr. Gingras testified that consumers of the Ripoff Report website's free reporting service range from unsophisticated to sophisticated. The Court finds Mr. Gingras credible in this regard.

32. There was no testimony about whether the appearance of websites in their present form would confuse consumers about which website they were visiting. The Court finds the Ripoff Report website to be distinct from and visually dissimilar to the Complaintsboard website. (<u>Compare</u> Ex. 28, <u>with</u> Ex. 110.)

33. Mr. Gingras also testified about the terms of service that Complaintsboard used as of December 17, 2008—the same day the prior litigation was instigated. (Ex. 4.) The terms were purportedly taken from the Ripoff Report website and modified for use on the Complaintsboard website, but mistakenly listed Xcentric in paragraph seven, which concerns limitation of liability. (<u>Id.</u> at 7.) The Court finds Mr. Gingras credible in this regard.

**<u>Evidence of Actual Confusion</u>**

34. Before instituting the first lawsuit, between April 2, 2008, and November 13, 2008, Xcentric received one letter and two emails about complaints on Complaintsboard. (Exs. 5, 6, 7.) Each piece of correspondence requested Xcentric remove a complaint on Complaintsboard.

35. The letter makes no mention of either of the service marks at issue, and gives no explanation as to how or why the author determined that Complaintsboard was owned by Xcentric. (Ex. 5.) The only testimony about the matter was from Xcentric's general counsel at the time, David Gingras, and was both tenuous and speculative. Given the speculative nature of this evidence, the Court does not credit Mr. Gingras on the matter. The Court further finds the letter does not suggest Xcentric's service marks on the Complaintsboard website resulted in any confusion.

36. Likewise, the first email makes no mention of either of the service marks at issue, and gives no explanation as to how or why the author determined that Complaintsboard was controlled by Xcentric. (Ex. 6.) There was no testimony on the matter. The Court finds this email does not suggest Xcentric's service marks on the Complaintsboard website resulted in any confusion.

37. The second email requests Xcentric remove a "Rip-off report Investigation" on the

Complaintsboard website, and also inquires whether Complaintsboard is using Xcentric's name. (Ex. 7.) The only testimony about how or why the author thought Xcentric may control the Complaintsboard website was speculative. As such, the Court does not credit Mr. Gingras on the matter. The Court further finds the email does not suggest Xcentric's service marks on the Complaintsboard website resulted in any confusion.

38.   Mr. Gingras testified that many references to the Ripoff Report that existed in 2008 have been removed. The Court finds Mr. Gingras credible on the matter. Consequently, even if these three pieces of correspondence were evidence of actual confusion based on Xcentric's use of the mark, they are not evidence that there is a likelihood of confusion between the two websites as they exist today.

39.   On cross-examination about what may have led to actual confusion, Mr. Gingras testified that as of April 2008, the terms of service were the only thing he saw that linked Complaintsboard with Xcentric. (See Ex. 4.) The Court finds this testimony credible and assigns it substantial weight.

40.   There is no evidence of actual confusion after November 13, 2008.

**Evidence of Infringement**

41.   Xcentric alleges there were more than four thousand instances of infringement. As proof, Xcentric introduced three categories of evidence: screenshots of Google® search results; screenshots of the source code of some Complaintsboard webpages; and printouts and screenshots of some Complaintsboard webpages.

*Google® Search Results*

42.   Xcentric's only evidence for the vast majority of the alleged instances of infringement comes from one undated screenshot of a search query performed by Mr. Gingras while he was general counsel for Xcentric. (Ex. 23.) Mr. Gingras testified that he took the screenshot in January 2011, which the Court finds credible.

43.   The search was for the DON'T LET THEM GET AWAY WITH IT service mark and the scope of the query was confined to the Complaintsboard website.

44.    The screenshot suggests that there were "About 4,290 results," but the screenshot displays only the first 10 results. Mr. Gingras testified that he viewed the first 10 pages of search results and that each page of results was the same. Mr. Gingras did not testify that he actually visited each page. The Court finds Mr. Gingras' testimony credible to the extent he superficially scanned more than one page of results.

45.    In a different Google® search performed by Mr. Gingras for a non-trademarked phrase on the Complaintsboard website, the estimated <u>number of results</u> was extremely varied depending on the which <u>page of results</u> was being viewed. (Ex. 19.) Specifically, the third page of results estimated 2,200 results; the fifth page of results estimated 4,270 results; and the sixth page of results estimated only 60 results. (<u>Id.</u>) Mr. Gingras also testified that he did not have any knowledge about how Google® counts search results, nor could he explain the discrepancy.

46.    To the extent that Mr. Gingras testified he performed the searches in Exhibit 19 over the course of several years, the Court finds his testimony not credible. Not only do the searches themselves contain no dates beyond the year 2010, but the Complaintsboard webpages all display the same holiday theme. (Ex. 19.) The Court finds that all the searches in Exhibit 19 were performed during the same January 2011 time period.

47.    Mr. Kudrjavcev professed knowledge in the way Google® counts search results and testified that the number of estimated results depends on a wide array of factors. Specifically, a single dynamic page can appear as several different results on Google® depending on how the page's content is organized. Mr. Kudrjavcev illustrated his testimony by demonstrating how pages on the Complaintsboard website provide an option to sort comments according to their popularity, and how Google® reports distinct search results for one Complaintsboard page. The Court finds Mr. Kudrjavcev's testimony credible with regard to how Google® counts search results.

48.    A second factor that may distort the number of search results is Google®'s practice of taking snapshots of webpages to generate a searchable index of "cached" webpages. Mr. Gingras testified he was aware that Google® caches webpages, but did not know

for how long. Mr. Kudrjavcev testified that he has removed pages that were still appearing in Google® results one year later, and that the only way to know whether a Google® search result actually exists and is not merely the artifact of a cached page is to actually visit that page. The Court finds Mr. Kudrjavcev credible with regard to Google®'s cache practices.

49.   Mr. Kudrjavcev testified that tens of thousands of webpages were removed following an update to Google®'s search algorithms in 2011—about the same time Mr. Gingras performed the search in Exhibit 23. Mr. Kudrjavcev testified that the reason the pages were removed was to increase the prominence of the Complaintsboard website in Google®'s new method of sorting search results. Mr. Kudrjavcev testified he did not know whether any of the removed pages contained Xcentric's marks, and that he had no knowledge of pending litigation. Mr. Kudrjavcev further explained the pages were not preserved because Complaintsboard had no reason to warehouse what it perceived as trash. The Court finds Mr. Kudrjavcev's testimony regarding the removed webpages to be credible.

50.   The Court finds that the number of results reported in Exhibit 23 to be unreliably and substantially inflated. As to the 10 search results that are visible in Exhibit 23, the context surrounding the words RIPOFF REPORT and DON'T LET THEM GET AWAY WITH IT is so limited that the Court cannot conclude it is more likely than not that usage of the words was infringing.

51.   Accordingly, the Court gives no weight to Exhibit 23 as evidence of infringement.

*Metatags*

52.   Xcentric introduced evidence of a Google® search query performed by Mr. Gingras in preparation for litigation against Complaintsboard while he was general counsel for Xcentric. The search query was for a non-trademarked phrase "are you also a victim," which is frequently used by Ripoff Report. (Ex. 19.) Some of the results of the search query displayed the DON'T LET THEM GET AWAY WITH IT mark and linked to pages on the Complaintsboard website.

53. Mr. Gingras testified that when he navigated to the corresponding Complaintsboard pages, the DON'T LET THEM GET AWAY WITH IT mark was not visible. However, the mark was contained within the "metatags" of the web page's HTML source code. Mr. Gingras testified that a user cannot change metatags and source code, but that an administrator could. He further testified he was only generally familiar with web page source code.

54. Mr. Gingras testified that he personally examined 100 webpages, but only documented 10 of them. The Court finds Mr. Gingras credible to the extent that some pages' source code appeared similar to him. The Court does not credit Mr. Gingras to the extent he claims to have examined the source code of 100 pages.

55. Mr. Kudrjavcev testified that users could indeed generate metatags that appeared on Complaintsboard webpages and explained how proprietary Complaintsboard source code dynamically generates metatags based on user searches on the Complaintsboard website. (Ex. 109.) Mr. Kudrjavcev further explained that if the company that was searched for did not exist, then the code would create a new web page for that company.

56. Mr. Kudrjavcev testified that after the default judgment, Complaintsboard attempted to remove all instances of the DON'T LET THEM GET AWAY WITH IT MARK, regardless of use, but inadvertently neglected to remove the phrase from the metatags.

57. The Court finds Mr. Kudrjavcev credible with regard to the metatags and the proprietary code.  In the absence of any evidence to the contrary, the Court accepts as true Mr. Kudrjavcev's explanation of how the phrase appeared in the metatags.

58. The Court considers Exhibit 19 as evidence that unidentified users of the Complaintsboard website queried the phrase "don't let them get away with it," and that Complaintsboard attempted to remove the phrase after the default judgment.

*Webpages*

59. Other than the Google® search results (Ex. 23) and the metatag webpages (Ex. 19), the only evidence of Complaintsboard's potentially infringing use of the service

marks RIP-OFF REPORT and/or DON'T LET THEM GET AWAY WITH IT are the screenshots and printouts of 56 different Complaintsboard webpages. (Ex. 116.) The pages were captured either during January 2011, or March 2013; two pages were captured at both times. (Compare id., CB00017, 22, with id., CB000090, 36.)

60.   32 of these pages contain user submitted comments in which the phrase "don't let them get away with it" is clearly used as part of ordinary speech. (Id., CB00040, 52, 53, 55, 56, 57, 59, 60, 61, 62, 63, 64, 66, 67, 68, 69, 70, 71, 73, 74, 75, 76, 78, 79, 80, 81, 82, 83, 84, 85, 87, 88). Similarly, one comment refers to past actions taken at the Ripoff Report website that resolved their dispute. (Id., CB000065.)

61.   Five of these pages contained the following solicitation: "Are you also a victim of [company name]? Submit a complaint to help other consumers to be educated and don't let them get away with it!" (the "Solicitation Pages"). (Id., CB00030-34, 92-96.) All of the Solicitation Pages were created between November 2008 and July 2009.

62.   Mr. Kudrjavcev testified that the Solicitation Pages were created by a now defunct part of the Complaintsboard website referred to as "Suspicious Companies." The Court finds this testimony credible.

63.   The remaining 18 pages contain user submitted comments that were purportedly copied and pasted, or "scraped," from the Ripoff Report website (the "Scraped Posts").

64.   Eight of the Scraped Posts are an article written by Ripoff Report founder Ed Magedson about how to dispute fraudulent charges. (Ex. 116, CB00001-2, 5-6, 11-12, 17-18, 21-22, 38-39, 43-44, 65.) The article appears with varying degrees of modification. The title, if present, states "HERE IS WHAT RIP OFF [REPORT] SUGGESTS YOU DO." (E.g., id., CB000005, 65.) The article refers to "RIP OFF [REPORT]" and typically closes with: "Remember . . . Don't let them get away with it! Make sure they make the Rip-off [Report]." (Id.) Some of the posts include the concluding signature of Ed Magedson as the original author and founder of RipoffReport.com. (E.g., id., CB000065.)

65.  Six of the Scraped Posts are variations of a solicitation: "Are you also a victim of the same company or person? Want justice? File a rip off [report] [help other consumers to be educated] and don't let them get away with it." (Id., CB00026, 46-47, 50-51, 58, 72, 89.)

66.  There is some overlap in some posts and on some of the pages. Two Scraped Posts combine the solicitation with the article or different Ripoff Report content. (Id., CB00038-39, 77.) One page had both a scraped solicitation comment as well as comments that used the words Ripoff Report to describe Xcentric's website. (Id., CB00048-49). Another page had comments that used "don't let them get away with it" as part of ordinary speech, as well as content that was scraped from the front page of the Ripoff Report website. (Id., CB00054.)

67.  Complaintsboard introduced evidence of the author information of each of the allegedly infringing posts. (Ex. 113.) Mr. Kudrjavcev testified that none of the authors of any of the posts in question were agents of Complaintsboard, and explained that sometimes users will submit a post to the Ripoff Report website, copy that post, and then submit the copied post to the Complaintsboard website  because they are lazy. The Court finds Mr. Kudrjavcev credible in this regard.

68.  Xcentric argued that the allegedly infringing comments were posted by or at the behest of employees of Mr. Kudrjavcev,  Mediolex, and/or Complaintsboard because the email addresses of the authors of those posts may not be accurate.

69.  Mr. Kudrjavcev explained that Complaintsboard does not verify the accuracy of email post authors' addresses. The Court does not infer that the possible use of fictitious email addresses by posters to mean that one or more of Defendants caused the allegedly infringing posts.

70.  Xcentric also argued that one or more of Defendants caused the allegedly infringing content to be posted because some of the names of authors for identical posts submitted to Judge Holland as part of the prior litigation did not overlap. The Court does not infer that different unverified author names means that Mr. Kudrjavcev,

1    Mediolex, and/or Complaintsboard caused the allegedly infringing posts.

2    71.    Additionally, the Court finds Mr. Kudrjavcev's testimony about the inability of

3    Latvian residents to directly access the Complaintsboard website to be credible.

4    **Complaintsboard's Efforts to Remove and/or Avoid Xcentric's Service Marks**

5    72.    Regarding the prior litigation, Mr. Kudrjavcev testified that a lone employee scraped

6    content from the Ripoff Report website, that the employee did this on their own

7    initiative, and that the employee had since been fired. Pursuant to the default

8    judgment, Complaintsboard used automated searches to identify and remove the

9    scraped content. Mr. Kudrjavcev testified that these searches were limited to content

10   that would appear on the webpages, and did not catch content contained in metatags.

11   The Court finds this testimony credible.

12   73.    Additionally, as a result of the prior litigation, the Complaintsboard website

13   implemented a filter to preclude consumers from posting Ripoff Report's registered

14   service marks. (See Ex. 102.) At least one user of the Complaintsboard website has

15   commented on the filter and concluded that Complaintsboard was attempting to

16   prevent competition with the Ripoff Report. (Id., MED000040.) Mr. Kudrjavcev

17   testified that the filter has prevented many attempts to take reports from the Ripoff

18   Report and post them on Complaintsboard. The Court finds this testimony credible.

19   74.    On November 10, 2009, one month after default judgment had been entered,

20   Complaintsboard sent a self-titled "ultimatum" to Xcentric demanding Xcentric

21   withdraw a notice sent to Complaintsboard's hosting provider. (Ex. 9.) Mr. Gingras,

22   as general counsel for Xcentric, responded that the notice would be withdrawn only

23   after Complaintsboard submitted a complete copy of the entire website on hard disk

24   to determine exactly what must be removed. (Id.) Complaintsboard responded that it

25   had already removed all duplicated content and asked for the URLs of any remaining

26   infringing content. (Id.) Mr. Kudrjavcev testified that Xcentric never submitted any

27   URLs of infringing content, and Xcentric introduced no evidence to the contrary. The

28   Court finds Mr. Kudrjavcev's testimony credible.

75.   The Court finds that Complaintsboard and Mediolex made good faith efforts to prevent Xcentric's registered marks from appearing on the Complaintsboard website.

## CONCLUSIONS OF LAW

**Trademark Infringement Under Federal Law**

76.   To prevail on its claim of trademark infringement, Xcentric must establish: (1) it has an enforceable ownership interest in a valid mark, and (2) that Defendants used that mark in commerce in a manner that is likely to cause consumer confusion as to the source, sponsorship, affiliation, or connection of Defendants' services. 15 U.S.C. § 1114; Karl Storz Endoscopy America, Inc. v. Surgical Technologies, Inc., 285 F.3d 848, 853-54 (9th Cir. 2002).

77.   Registered marks are presumptively valid.15 U.S.C. § 1115(a). This presumption becomes conclusive if the mark has been registered more than five years and certain statutory requirements have been met. 15 U.S.C. § 1065. The burden of proving registration and incontestibility falls on the plaintiff. Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002).

78.   The marks at issue are registered and owned by Duckbites. Xcentric has an interest in prosecuting alleged infringement in the '949 RIP-OFF REPORT and '390 DON'T LET THEM GET AWAY WITH IT service marks. However, Xcentric failed to produce evidence that it was a licensee of, or was otherwise entitled to exclude others from using the '560 RIPOFF REPORT service mark. Therefore, the Court finds that Xcentric does not have an interest in prosecuting alleged infringement of the '560 RIPOFF REPORT service mark.

79.   Although the '949 RIP-OFF REPORT and '390 DON'T LET THEM GET AWAY WITH IT service marks are not entitled to the conclusive presumptions afforded incontestible marks because Xcentric failed to introduce evidence that the marks were continuously used in commerce for the statutory period, see 15 U.S.C. § 1065(3), Defendants did not present any evidence that the marks were not valid. Therefore, Xcentric has established by a preponderance that it has an enforceable ownership

interest the '949 and the '390 service marks, and that the marks are valid.

80. "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade"; a mark is deemed to be used in commerce "when it is used or displayed in the sale or advertising of services." 15 U.S.C. § 1127.

81. Xcentric failed to carry its burden about whether any of the allegedly infringing uses of the '949 and the '390 service marks were used in commerce.

82. Xcentric failed to prove it was more likely than not that Defendants posted Xcentric's marks to the Complaintsboard website. The Court finds that Complaintsboard, Mediolex, or Mr. Kudrjavcev **did not** themselves post Xcentric's marks.

83. To be liable for contributory trademark infringement, a defendant must either (1) " 'intentionally induce[]' the primary infringer to infringe," Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting  Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982)), or (2) continue to provide a directly controlled and monitored service to the primary infringer with knowledge that the infringer was using the service to infringe, id. (quoting Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984 (9th Cir. 1999)).

84. The Court finds that Xcentric failed to prove by a preponderance of the evidence that one or more Defendants induced, intentionally or otherwise, any other person to post the words comprising Xcentric's marks to the Complaintsboard website.

85. The Court further finds that Complaintsboard has direct control of the Complaintsboard website, but that Xcentric failed to show it was more likely than not that one or more Defendants knew or should have known their service was being used to infringe on Xcentric's marks. Xcentric also failed to carry its burden as to whether one or more Defendants monitored the more than 5 million webpages on the Complaintsboard website, or that such monitoring is even possible.

86. The Court finds that Defendants have made good-faith efforts to remove Xcentric's marks from the Complaintsboard website, and have instituted measures to prevent the marks from appearing, regardless of how the words constituting the marks are used.

87.   "Vicarious liability for trademark infringement requires 'a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.' " Perfect 10, Inc., 494 F.3d at 807 (quoting Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1150 (7th Cir. 1992)).

88.   The Court finds that Xcentric failed to show it was more likely than not that one or more Defendants had any relationship with any person that posted the words comprising Xcentric's marks to the Complaintsboard website.

89.   The Court finds that even if the marks are likely to cause confusion, Xcentric has failed to establish Mr. Kudrjavcev, Mediolex, and/or Complaintsboard are directly, contributorily, or vicariously liable for infringement, if any, on the '949 RIP-OFF REPORT and/or the '390 DON'T LET THEM GET AWAY WITH IT service marks.

90.   Even if Xcentric had established that the words constituting the '949 and the '390 service marks were used in commerce on the Complaintsboard website, and also that Defendants were somehow liable, the manner in which the marks were used was not likely to cause consumer confusion.

91.   There are eight relevant factors to determining consumer confusion: (1) the strength of the mark; (2) proximity of the services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) type of service and the degree of care likely to be exercised by the consumers; (7) defendant's intent; and (8) likelihood of expansion of product lines (the "Sleekcraft factors"). Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1145 (9th Cir. 2011) (quoting AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)).

92.   The Sleekcraft factors are not well suited for analyzing the unauthorized use of a mark on the internet "in a manner calculated 'to capture initial consumer attention.' " Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1062 & n.24 (9th Cir. 1999) (quoting Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1045 (9th Cir. 1997)). A defendant may be liable for this "initial interest

confusion" if the defendant affirmatively uses the plaintiff's mark with the effect of diverting people from the plaintiff's website to the defendant's website. <u>Playboy Enters., Inc. v. Netscape Commc'ns Corp.</u>, 354 F.3d 1020, 1025-26 (9th Cir. 2004); <u>Brookfield Commc'ns</u>, 174 F.3d at 1062.

*Strength of the Marks*

93.    The parties presented no evidence on the strength of the marks. The Court finds the '949 RIP-OFF REPORT service mark to identify the Ripoff Report service by the same name. Despite Xcentric's failure of proof, the mark possesses sufficient strength to distinguish the Ripoff Report website as the provider of the service. The '949 mark is weak. <u>See</u> <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002).

94.    The Court finds the '390 DON'T LET THEM GET AWAY WITH IT service mark to describe an aspect of the Ripoff Report service. However, unlike the '949 mark, the '390 mark is conceptually weak and there was no evidence that anyone associates the mark with Xcentric or Ripoff Report in any manner, whatsoever. As the mark does not suggest the provider of any service, it has no acquired meaning, and is not entitled to any protection. <u>See</u> <u>Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.</u>, 198 F.3d 1143, 1047 (9th Cir. 1999). Moreover, the evidence established that the public would be likely to use this phrase when complaining about companies.

95.    The weakness of the '949 RIP-OFF REPORT and '390 DON'T LET THEM GET AWAY WITH IT service marks weighs heavily against likelihood of confusion.

*Proximity of the Services*

96.    The Complaintsboard complaint service and the Ripoff Report report service are identical in substance, but different in form. This factor weighs in favor of a likelihood of confusion.

*Similarity of the Marks*

97.    While Complaintsboard has its own service marks that are distinct from those of Xcentric, the words comprising the '949 and '390 service marks appeared on a tiny fraction of the pages on the Complaintsboard website.

98.     This factor weighs very slightly in favor of confusion.

*Evidence of Actual Confusion*

99.     There has been no evidence of actual confusion since Xcentric's name was removed from Complaintsboard's terms of service. Nor has there been any evidence that confusion resulted from the appearance of Xcentric's marks on the Complaintsboard webpage.

100.    To the contrary, some comments discuss the Ripoff Report on the Complaintsboard website as a distinct entity.

101.    This factor weighs against confusion.

*Type of Service and Degree of Care Likely to be Exercised by Consumers*

102.    The services of both Ripoff Report and Complaintsboard are a free forum for posting complaints about businesses. The Court finds that the degree of care likely to be exercised by unsophisticated consumers to be minimal, but that sophisticated consumers would exercise care.

103.    This factor is neutral.

*Defendant's Intent*

104.    There is no evidence that one or more Defendants intended for Xcentric's marks to appear on the Complaintsboard website. To the contrary, the weight of the evidence is that Defendants have endeavored to prevent Xcentric's marks from appearing on the website.

105.    This factor weighs heavily against likelihood of confusion.

*Likelihood of Expansion*

106.    There is no evidence that Complaintsboard will be expanding its product line into the Consumer Advocacy Program arena.

107.    This factor is neutral.

*Summary*

108.    The Court finds that Defendants did not destroy Complaintsboard webpages in anticipation of this litigation. There is no evidence that those pages would have been

any different from the non-infringing pages in the record. Further, there is no evidence that these pages were destroyed in bad faith. The Court draws no adverse inference from the destruction of the pages. See Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991).

109. The Court finds that the number of pages on which the words constituting Xcentric's marks are visible or were used in metatags is 66. There are more than five million pages on the Complaintsboard website.

110. The majority of the 66 pages involve a non-service mark use of the words comprising the '390 DON'T LET THEM GET AWAY WITH IT mark.

111. The Court finds that Xcentric's marks were not used to designate a source of origin, affiliation, or sponsorship.

112. The Court finds that none of the 66 pages used either mark in a manner that is likely to confuse consumers.

113. There is some evidence that the '390 DON'T LET THEM GET AWAY WITH IT service mark was in metatags on some pages at some point in time. However, The only search queries in which the marks were displayed as search results were when Mr. Gingras specifically narrowed the scope of his search to only the Complaintsboard website. There is no evidence that Complaintsboard would appear if the same search was performed without being confined to the Complaintsboard website. There is no evidence that traffic was diverted to Complaintsboard, and there is no evidence that Complaintsboard capitalized on Ripoff Report's good will.

114. The Court finds that none of the 66 pages resulted in initial interest confusion.

115. Consequently, the Court finds that there is no consumer confusion, and Xcentric's federal trademark infringement claim fails on this basis as well.

**Arizona Common Law Unfair Competition**

116. The common law doctrine of unfair competition encompasses several tort theories including deceptive marketing, trademark infringement, and other acts or practices that are determined to be unfair. Restatement (Third) of Unfair Competition § 1

1    (1995); <u>Fairway Constructors, Inc. v. Ahern</u>, 193 Ariz. 122, 125-26, 970 P.2d 954,

2    957-58 (App. 1998). "A person seeking relief under the residual rule . . . bears the

3    burden of establishing that the method of competition employed by the actor is

4    unfair." <u>Restatement (Third) of Unfair Competition</u> § 1 cmt. g.

5  117.  The only allegation in Xcentric's complaint that differed from the trademark

6    infringement allegations under federal law was that Complaintsboard avoided the time

7    and expense of building its own content and generating its own traffic. (Doc. 1 at 10.)

8    Xcentric failed to establish this conduct was unfair.

9  118.  The Court finds that Xcentric failed to show it was more likely than not that

10    Complaintsboard was spared the expense of building its own content. To the contrary,

11    the only evidence is that the overwhelming majority of Complaintsboard content is

12    distinct from Ripoff Report content.

13  119.  The Court finds Xcentric failed to show it was more likely than not that

14    Complaintsboard was spared the expense of generating its own traffic. Even if

15    Xcentric had shown that any Ripoff Report traffic was diverted to the

16    Complaintsboard website, Xcentric still failed to show that the diversion was caused

17    by or was attributable to any Defendant.

18  120.  Because the Court finds that Xcentric failed to establish that any conduct by, or

19    attributable to, any Defendant was likely to deceive the public or was otherwise

20    tortious with respect to Xcentric, Xcentric's unfair competition claim under Arizona

21    law fails. <u>See</u>  <u>Restatement (Third) of Unfair Competition</u> § 1 cmt. g.; <u>Boice v.

22    Stevenson</u>, 66 Ariz. 308, 315, 187 P.2d 648, 653 (1947).

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the Court finds in favor of Mediolex, Complaintsboard, and Sergey Kudrjavcev on all of Xcentric's claims.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter judgment accordingly and terminate the case.

DATED this 3rd day of June, 2014.

Stephen M. McNamee
Senior United States District Judge